**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| IN RE: § | |
| § | |
| KENNETH MARSTON GOOD, § | CASE NO. 08-40955 |
| KG LEGACY OZARKS, LLC, § | JOINTLY ADMINISTERED |
| LEGACY CAPITAL INVESTMENTS, LLC, § | |
| KG LEGACY PREMIER, LLC, § | CHAPTER 11 |
| LMI LBL, LLC, § | |
| LMI 1 NEW, LP, § | |
| KG LEGACY JOSEY, LLC, § | |
| LMI 1 NEW PARKWAY, L.P., § | |
| § | |
| DEBTORS. § | |

**MEMORANDUM OPINION REGARDING MOTION FOR
RECONSIDERATION OF CONFIRMATION ORDER**

On February 19, 2009, the Court entered an Order Confirming Debtors' First Amended Joint Plan of Reorganization, as Modified (the "Confirmation Order"). Within ten days of the entry of the Confirmation Order, on March 1, 2009, RMR Investments, Inc. ("RMR") filed a Motion to Alter or Amend Judgment and Motion for Reconsideration (the "Motion for Reconsideration") pursuant to Federal Rule of Civil Procedure ("Rule") 59(e). *See* FED. R. BANKR. P. 9023. The Court conducted a hearing on the Motion for Reconsideration on March 24, 2009, and, at the conclusion of the hearing, took the matter under advisement.

**JURISDICTION**

This contested matter is a core proceeding pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(a), and the Court has authority to enter a final order pursuant to 28 U.S.C. §157(b)(2)(A), (L) and (O). The following constitutes the Court's findings of fact and

1

conclusions of law.  *See* FED. R. BANKR. P. 9014, 7052.[1]

## RELEVANT BACKGROUND

Kenneth Good has been involved in real estate for more than 40 years, and he does business through many different legal entities.  Between April 15, 2008 and June 30, 2008, each of the following debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"):  Kenneth Marston Good ("Mr. Good"), KG Legacy Ozarks, LLC ("KG Legacy Ozarks"), Legacy Capital Investments, LLC ("LCI"), KG Legacy Premier, LLC ("KG Legacy Premier"), LMI LBL, LLC ("LMI"), LMI 1 New, L.P. ("LMI 1 New"), KG Legacy Josey, LLC ("KG Legacy Josey"), and LMI 1 New Parkway, L.P. ("LMI 1 New Parkway") (collectively, the "Debtors").  The Debtors' cases have been jointly administered by this Court.

The Debtors' First Amended Joint Plan of Reorganization and First Amended Disclosure Statement were filed on October 24, 2008.  The Debtors and Legacy Roach, LLC, a non-debtor related entity, were the proponents of the plan.  In their joint plan, the Debtors proposed to pay all of their creditors in full by developing and selling various real estate assets over four years.  The Debtors anticipated that they would have a balance of approximately $85,000,000 at the conclusion of the four years, assuming these funds were not reinvested in real estate during the term of their plan.

Numerous creditors filed objections to confirmation of the Debtors' proposed plan of reorganization.  The various modifications filed by the Debtors resolved all objections except those raised by RMR.  At the confirmation hearing on December 9, 2008, which the Court continued to January 27, 2009 (the "Confirmation Hearing"), RMR appeared

---

[1] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such.  Likewise, to the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.

2

and opposed confirmation of the Debtors' plan.

RMR holds an allowed secured claim against LCI and an unsecured guaranty claim against Mr. Good. In particular, on or about June 27, 2007, RMR and LCI entered into a promissory note whereby RMR loaned the principal amount of $7,860,000 to LCI. The terms of the note required LCI to make monthly interest payments to RMR beginning on August 1, 2007 and continuing until the maturity date. The initial maturity date under the note was the earlier of one year after the date of the note or upon an event of default. The applicable rate of interest under the note was the higher of the prime rate plus 2.75% or 11% per annum. The note provided that the applicable rate of interest would increase by 4%, not to exceed the maximum lawful rate, upon the occurrence of an event of default.

In connection with the execution of the promissory note, LCI executed a Deed of Trust in favor of RMR on or about June 27, 2007. The Deed of Trust granted RMR a first priority security interest in 86.56 acres of land located in Flower Mound, Texas. The Deed of Trust also granted RMR, among other things, a first priority security interest in all mineral rights and contracts that LCI had or could acquire relating to the property. In addition, Mr. Good executed a guaranty agreement on or about June 27, 2007 whereby he guaranteed the obligation of LCI to repay the amounts due and owing to RMR.

On February 4, 2008, LCI granted ELAND ENERGY, INC. a second lien on the 86.56 acres. This was in direct violation of RMR's Deed of Trust, which states in Section 5.6 that LCI will not create or place a second lien on the property. RMR promptly notified LCI that an event of default had occurred. RMR and LCI then entered into an agreement pursuant to which LCI agreed to remove the lien no later than March

31, 2008. LCI, however, failed to remove the second lien. On April 7, 2008, RMR sent LCI another letter indicating that LCI had defaulted under the loan documents.

Mr. Good filed his voluntary petition on April 17, 2008. On June 3, 2008, LCI filed its voluntary petition. The principal balance owed to RMR as of LCI's petition date was $7,760,000. Since there is no dispute that RMR is oversecured, RMR's claim against LCI has continued to accrue interest and other charges. *See* 11 U.S.C. §506(b). RMR asserts that it was owed the total sum of $9,584,829.95 as of February 2009, which includes $7,760,000 in principal, unpaid interest at the contractual default rate of 15% per annum, interest on interest due, late charges, post-maturity consulting fees, and attorney's fees and expenses.

According to its bankruptcy schedules, LCI owned nine parcels of vacant property when it filed for bankruptcy relief. LCI estimated that all of these properties, including the 86.56 acres in which RMR has an interest, had a total market value of $60,000,000 exclusive of the value of any associated mineral interests. LCI estimated that the total secured debt relating to these properties was approximately $43,202,000.

In addition to its real estate assets, LCI disclosed in its bankruptcy schedules that it is the 100% owner of three of the Debtors – KG Legacy Ozarks, KG Legacy Premier, and KG Legacy Josey – as well as Legacy Roach. LCI valued its interest in these entities at approximately $13,000,000. LCI also listed as an asset the accounts receivable due from these and several other entities totaling nearly $7,000,000.

RMR obtained two valuations of the tract of land in which it has a secured interest during the pendency of LCI's bankruptcy case. RMR obtained an appraisal dated July 29, 2008, which stated that the value of the 86.56 acres was $11,500,000 as of that date

and that the property would take approximately 12 months to sell. RMR obtained a second appraisal dated November 19, 2008, which stated that the value of the 86.56 acres was $9,840,000 as of that date and that the property would take approximately 18-24 months to sell. With respect to the value of the mineral interests in which RMR also has a secured interest, the Debtors presented evidence that, if the 86.56 acres is considered together with several adjoining tracts of land owned by the Debtors or in which the Debtors plan to acquire an interest, all of the combined mineral interests have a total value of approximately $12,000,000.

Mr. Good has signed several operating reports for LCI since its petition date. Each of these operating reports lists the "total equity" in LCI as $16,797, 453. According to LCI's Statement of Financial Affairs, which LCI filed with its original bankruptcy schedules, Mr. Good owns 20% of the stock of LCI. The remainder of the stock is owed by KMG-GS Trust, which shares the same address as Mr. Good.

RMR's secured claim against LCI is treated in Class 10 of the Debtors' plan. Class 10 "consists of the Allowed Secured Claim of RMR in the approximate amount of $7,760,000." First Amended Plan at §3.10. The plan provides that RMR will receive quarterly interest on its secured claim at the Plan Rate, which is defined as the Prime Rate plus 1% "or such other rate as is determined by the Court at the Confirmation Hearing." First Amended Plan at §1.47. The plan further provides that RMR will receive minimum principle payments of 5% at the end of each calendar year until the promissory note matures under the plan. Although LCI originally proposed developing the mineral interests underlying the property securing RMR's claim, LCI deleted this provision and modified other aspects of its plan in response to RMR's objections to confirmation.

The plan, as confirmed by this Court, provides that ELAND ENERGY, INC. will release its liens on RMR's collateral. RMR will retain its liens on the 86.56 acres of raw land and associated mineral interests. However, the terms of the loan documents are modified to extend the maturity date of the promissory note to four years, lower the interest rate to the Plan Rate, and to provide that RMR will release its liens in the event LCI is able to sell certain tracts of the property for prices set forth in the plan. The plan contains a detailed procedure to determine the appropriate prices at which RMR must release its liens. The plan further provides that the total value of the collateral remaining after the sale of any portion of the tract must be at least 110% of the remaining amount of RMR's allowed secured claim.

Other than RMR, there were five lenders secured by Dallas-area commercial real property in these jointly administered cases. Mr. Good testified that he believed these lenders faced nominal risk in light of the fact that each lender was substantially oversecured. The Debtors reached agreements on post-confirmation interest rates and loan maturity dates with all of these lenders except RMR after extensive negotiation. Of these lenders, Century Bank, N.A. and First Community Bank agreed to and voted in favor of an interest rate fixed at prime plus 2%, Southwest Securities FSB and Charter FL, L.P. agreed to and voted in favor of a fixed interest rate of 6%, and Liberty Bankers Life Insurance Company agreed to and voted in favor of a fixed interest rate of 5% (after an initial three-month period in which interest would accrue at the contract rate).

In light of the modifications made to the plan, the following objections to confirmation of the Debtors' plan, as modified, remained at the time of the Confirmation Hearing on January 27, 2009:

(1) RMR contended that the plan unfairly discriminated against creditors holding guaranty claims;
(2) RMR contended that the plan was not feasible as it related to two of the Debtors – Mr. Good and LCI;
(3) RMR contended that the plan did not satisfy the best interest of creditors' test in violation of 11 U.S.C. §1129(a)(7);
(4) RMR contended that the treatment of its claim was unfair and inequitable; and
(5) RMR contended that Mr. Good and LCI filed the plan in bad faith.

The Court specifically addressed and overruled all but one of RMR's objections in its Confirmation Order. With respect to RMR's contention that the Debtors' proposed plan failed to satisfy the best interest of creditors' test set forth in §1129(a)(7) of the Bankruptcy Code, the Court confirmed the plan based on the Debtors' representation that the plan would be modified to allow unsecured creditors to receive interest, as follows:

> Where an estate's assets exceed claims, as is the case here, § 726(a)(5) of the Bankruptcy Code provides that an unsecured creditor is entitled to "interest at the legal rate from the date of the filing of the petition." Accordingly, pursuant to the agreement of the Debtors announced at the January 27, 2009 hearing on confirmation of the Plan, unsecured claimants in Class 19 under the Plan shall receive interest on their Allowed Unsecured Claims equal to the federal post-judgment interest rate effective under 28 U.S.C. §1961 on January 27, 2009, accruing from the later of the Effective Date or the date any such Claim becomes liquidated and non-contingent. The federal post-judgment interest rate effective under 28 U.S.C. § 1961 on January 27, 2009 was .43%.

Confirmation Order, ¶ 38.

## ANALYSIS

### A. RMR's Arguments for Relief Under Rule 59(e)

Motions to alter or amend a judgment under Rule 59(e) "serve the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989) (citations omitted). Altering, amending, or reconsidering a judgment is an extraordinary measure, which courts should use sparingly. *Southern Constructors Group, Inc. v.*

7

*Dynalectric, Corp.*, 2 F.3d 606, 611 (5th Cir. 1993) (noting that the standards applicable to Federal Rule 59(e) favor the denial of motions to alter or amend a judgment).  A Rule 59(e) motion should not be granted unless there is: (1) an intervening change in controlling law; (2) the availability of new evidence not previously available; or (3) the need to correct a clear error of law or fact or to prevent a manifest injustice. *See, e.g., Schiller v. Physicians Resource Group, Inc.*, 342 F.3d 563, 567 (5th Cir. 2003); *Russ v. Int'l Paper Co.,* 943 F.2d 589, 593 (5th Cir. 1991).  A Rule 59(e) motion "cannot be used to raise new arguments which could, and should, have been made before the judgment issued." *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990) (citing *Federal Deposit Insurance Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir. 1986)).

Here, RMR argues that the Court's confirmation of the Debtors' reorganization plan was a manifest error of law.  A "manifest error" is generally understood as "[e]vident to the senses, especially to the sight, obvious to the understanding, evident to the mind, not obscure or hidden, and is synonymous with open, clear, visible, unmistakable, indubitable, indisputable, evident, and self-evident." *Bank One, Texas, N.A. v. F.D.I.C.*, 16 F.Supp.2d 698, 713 (N.D. Tex. 1998) (quoting BLACK'S LAW DICTIONARY 962 (6th ed. 1990)).  "Error" is generally understood as "[a] mistaken judgment or incorrect belief as to the existence or effect of matters of fact, or a false or mistaken conception or application of the law" and "[a]n act involving a departure from truth or accuracy; a mistake; an inaccuracy; as, an error in calculation." *Id.* (quoting BLACK'S LAW DICTIONARY at 542-34 (6th ed. 1990)).  "Under these definitions, a "manifest error" is an obvious mistake or departure from the truth." *Id.*

In its Motion for Reconsideration, RMR argues that the Court erred in concluding

8

that the plan is "fair and equitable" as defined in Bankruptcy Code §1129(b)(2). RMR argues that a solvent debtor such as LCI is required to pay the contractual default rate of interest as a matter of law and that the extension of the maturity date of its loan to four years violates the absolute priority rule by allowing Mr. Good to enjoy his equity interest in the Debtors while RMR remains unpaid. RMR further argues that the partial release provisions in the plan impose a material risk on RMR. RMR argues that Court should have required LCI to preserve the equity cushion it claimed as of the petition date – 145% (*i.e.*, $11,500,000 /$7,951,269.58 = 145%) – especially in light of the declining value of its collateral. RMR seeks to vacate the Confirmation Order or, alternatively, to require LCI to modify the confirmed plan to increase the rate of interest to be paid to RMR to the contractual default rate, shorten the maturity date under the plan to three years (at most), and modify the calculation for the partial release of RMR's collateral.

### B. The "Fair and Equitable" Requirement for Confirmation

As previously discussed, the Debtors proposed a joint plan that collectively addressed all secured and unsecured obligations of each of the Debtors. LCI's secured obligation to RMR is addressed in Class 10. RMR is the sole creditor in Class 10, and RMR objected to confirmation of the Plan.

In order to "cram down" a plan over the objection of a dissenting class such as RMR, all requirements of §1129(a) must be met (except for requirement in §1129(a)(8) that plan must be accepted by each impaired class of claims or interests). Critical among these requirements is the condition that the plan may be confirmed only if it is fair and equitable with respect to each impaired class of claims or interests which did not accept the plan. By incorporating the fair and equitable standard in §1129(b) of the Bankruptcy

9

Code, Congress codified the absolute priority rule, which provides that, absent full satisfaction of a creditors allowed claims, no member of a class junior in priority to that creditor may receive anything on account of their claim or equity interest. *See In re Dow Corning Corp.,* 244 B.R. 678, 688-96 (Bankr. E.D. Mich. 1999) (discussing the historical underpinnings and legislative history of the "fair and equitable" standard).

Section 1129(b)(2) defines the meaning of "fair and equitable" as it pertains to certain classes of claims. Section 1129(b)(2)(A) provides three express alternatives in order that a plan may be found to be fair and equitable with respect to a class of secured claims. This provision states that, with respect to a class of secured claims, the condition that a plan be fair and equitable includes a requirement that the plan must provide one of the following: (i) the claimant retains its liens and receives deferred cash payments totaling its allowed claim; (ii) the claimant's collateral be sold with liens attaching to the proceeds of sale; or (iii) the claimant receives the indubitable equivalent of its secured claim. 11 U.S.C. §1129(b)(2)(A) (i) – (iii). A plan which does not meet the standards set forth in §1129(b)(2) of the Bankruptcy Code cannot be "fair and equitable." *See, e.g., In re D & F Construction, Inc.,* 865 F.2d 673, 675 (5th Cir. 1989) (discussing the cramdown of a reorganization plan).

A bankruptcy court may approve a reorganization plan that "include[s] any … appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. §1123(b)(6). In most cases, the role of the bankruptcy court in approving a plan of reorganization is to "guide the division of a pie that is too small to allow each creditor to get the slice for which he originally contract*." In re Chicago*, 791 F.2d 523, 528 (7th Cir. 1986). This case, however, involves a solvent borrower – a

relatively rare situation in bankruptcy. The primary issue at the Confirmation Hearing and in the Motion for Reconsideration is whether, as a matter of law, RMR is entitled to receive its contractual default rate of interest from LCI rather than the Plan Rate as determined by the Court.

### 1. The "Cramdown" Interest Rate

As previously discussed, the plan provides that LCI will pay RMR the "Plan Rate," which is defined as the prime rate plus 1% "or such other rate as is determined by the Court at the Confirmation Hearing …." First Amended Plan at §1.47. The Confirmation Order reflects that the prime rate of interest was 3.25% as of January 27, 2009. RMR's arguments at the Confirmation Hearing on January 27, 2009, focused on whether the Plan Rate appropriately accounted for the risks to RMR under the Plan. *See Till v. SCS Credit Corporation,* 541 U.S. 465 (2004) (adopting a two-part "prime-plus" formula for purposes of compliance with §1325(a)(5)(B)(ii)). RMR presented no credible evidence establishing that its risks were any greater than those faced by similarly situated secured creditors who agreed to a post-confirmation interest rate of 5-6% under the plan. The Court, based on the record before it, concluded that interest at the rate of prime plus 2% satisfied the requirement that the Debtors' plan must be fair and equitable.

In the Motion for Reconsideration, RMR elaborates on an argument raised at the Confirmation Hearing on December 8, 2008. RMR argues that, since LCI is solvent, the Court should have enforced the contractual rights of the parties by awarding RMR post-confirmation interest at the default rate of 15% per annum or no less than the contractual rate of interest of 11% per annum. RMR alternatively argues that the evidence at the Confirmation Hearing was insufficient to support a finding that the applicable market rate

11

of interest was 5-6% per annum.  Mr. Good retains his equity interest in the Debtors under the plan, and RMR asserts that LCI's "sole purpose in reducing the interest rate is to benefit the equity interest of Mr. Good."  Motion at ¶ 24.

LCI responds that none of the cases cited by RMR in support of its argument relate to the interest rate awarded to a secured creditor pursuant to a plan of reorganization.  LCI argues that applying these cases to confirmation and requiring a debtor to pay post-confirmation interest at the contract rate would run afoul of the debtor's right to "cram down" a lower rate of interest on a secured creditor under §1129(b)(2)(A) of the Bankruptcy Code.  However, one of the cases cited by RMR in its arguments to this Court did, in fact, address whether the contractual default rate of interest is the appropriate interest rate under a plan of reorganization in a case involving a solvent debtor.  *See In re Dow Corning Corp.*, 456 F.3d 668 (6th Cir. 2006) (addressing whether unsecured commercial contract creditors should have been awarded interest at the contractual default rate under the plan).  Although *Dow Corning* involved several unsecured creditors, as LCI points out in its response to RMR's Motion for Reconsideration, the fundamental principles addressed by the Sixth Circuit apply with equal force to LCI's treatment of RMR.

In cases involving solvent debtors, courts "have overwhelmingly concluded that there is a presumption that the default interest rate should be allowed."  *Dow Corning,* 456 F.3d at 380.  "In this context, the rational for use of the contract rate is straightforward:  A debtor with the financial wherewithal to honor its contractual commitments should be required to do so."  *In re Dow Corning*, 244 B.R. at 695.  "The only good reason for refusing to give a creditor in reorganization all that he bargained for

when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full." *Id.* (quoting *Matter of Chicago, Milwaukee, St. Paul & Pac. Ry.*, 791 F.2d 524, 527 (7th Cir. 1986)). *See also Johnson v. Norris,* 190 F. 459 (5th Cir. 1911) (an unsecured claimant may collect post-petition interest if the estate is solvent).

The Fifth Circuit has not addressed the enforcement of the contractual rights of an oversecured creditor in a bankruptcy case involving a solvent debtor. However, in cases involving insolvent debtors, the Fifth Circuit has expressed a bias towards or preference for the use of the contact rate when determining the appropriate cramdown interest rate. In *Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160 (5th Cir. 1993), for example, the Fifth Circuit found that "often the contract rate will be an appropriate rate but reference to a similar maturity Treasury rate is instructive. The Treasury rate is helpful because it includes all necessary factors except the risk premium." *See id.* at 1169.

The Fifth Circuit revisited the issue in *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997). The debtor in that case had requested that the Fifth Circuit develop a formula for determining an appropriate cramdown interest rate. In declining to do so, the Fifth Circuit recognized that "[c]ourts have used a wide variety of different rates as benchmarks in computing the appropriate interest rate (or discount rate as it is frequently termed) for the specific risk level in their cases." *See id.* (citation omitted). As the determination of the appropriate rate of interest is a fact intensive one, the Fifth Circuit refused to "tie the hands of the lower courts as they make the involved factual determination in establishing an appropriate interest rate." *See id.* After considering the contract rate and the treasury rate, the Fifth Circuit upheld the bankruptcy court's

13

determination that the contract rate was the appropriate rate of interest. *See id.* ("The bankruptcy court concluded that the contract rate of 11.5% included a risk premium to account for the increased risk FSA would bear as a claimant under the Plan and for not receiving its money today. In other words, the contract rate was a reasonable rate that adequately compensated for risk."). *See also Green Tree Fin. Servs. v. Smithwick (In re Smithwick)*, 121 F.3d 211, 213 (5th Cir. 1997) ("Applying the requirements of §1129(b)(2)(A)(i)(II), the bankruptcy court is to make a factual determination of the interest rate appropriate under all the circumstances and to evaluate whether the payments under the plan will provide the creditor with the present value of his allowed secured claim. This court has declined to 'establish a particular formula' for the cramdown interest rate in Chapter 11 cases. However, we have noted that '[o]ften the contract rate will be an appropriate rate' and that '[n]umerous courts have chosen the contract rate if it seemed to be a good estimate as to the appropriate discount rate.'") (citations omitted).

In this case, there is no dispute that LCI was in default of its contractual obligations to RMR when it filed for bankruptcy protection, that LCI is solvent, or that RMR is oversecured. RMR, therefore, seeks to collect interest on its allowed secured claim in LCI's bankruptcy case at the contractual default rate of 15%. Payment of interest to RMR at the contractual default rate would not reduce the payment that any other secured or unsecured creditor is entitled to receive under the plan. While payment of the default rate of interest would involve a significant amount of money in this case,[2] such payment would simply reduce the $85,000,000 in equity that may be available to Mr. Good at the conclusion of the plan in four years. As Mr. Good testified during the

---

[2] In an amended proof of claim filed on March 12, 2009, RMR states that $1,030,306.04 in accrued interest was due and owing to it as of February 19, 2009 based on the contractual default rate of interest.

14

Confirmation Hearing, "I will be paid $20,000 a month [by LCI] … [b]ut my main compensation is the results at the end of the plan because I am the primary beneficiary." Tr. at p. 90 (Dec. 8, 2008). The Court concludes that, under the circumstances of this case, LCI failed to rebut the presumption that RMR is entitled to interest at the contractual default rate of 15% per annum.

### 2. The "Indubitable Equivalent"

Even if a plan fails to satisfy §1129(b)(2)(A)(i) by providing for an appropriate cramdown rate of interest, §1129(b)(2)(A)(iii) provides that a plan may nonetheless be confirmed as "fair and equitable" if the secured creditor will realize the "indubitable equivalent" of its secured claim under the plan. It is settled that the concept of indubitable equivalence is rooted in the language of *In re Murel Holding Corp.,* 75 F.2d 941 (2nd Cir. 1935). *See* 124 Cong. Rec. H 11089 (daily ed. September 28, 1978) (statement of Rep. Edwards), *reprinted in* 1978 U.S.Code Cong. & Admin. News 6436 at 6475. In *Murel,* the Second Circuit stated that

> a creditor who fears the safety of his principal will scarcely be content with ... [interest payments alone]; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that ... unless by a substitute of the most indubitable equivalence.

*Murel,* 75 F.2d at 942. The doctrine of absolute priority provides that senior classes must receive full compensation for their claims, or a substitute of indubitable equivalence, before other creditors and shareholders can participate. *See, e.g., Consolidated Rock Products Co. v. DuBois,* 312 U.S. 510 (1941); *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106 (1939).

Where a secured creditor will receive payment in full on its allowed secured claim over a reasonable period of time with an appropriate interest rate, the indubitable

equivalent standard is satisfied. *See, e.g., Matter of Sandy Ridge Development Corp.,* 881 F.2d at 1350 (discussing "indubitable equivalence"). The Court has previously concluded that the appropriate interest rate in this case as to RMR is 15% per annum, and LCI proposes to pay RMR in full under the plan.[3] With respect to the LCI's proposal to repay RMR over four years, the plain terms of the Bankruptcy Code provide that a plan may extend the maturity date of a loan. *See* 11 U.S.C. §1123(a)(5) ("[A] plan [of reorganization] shall ... provide adequate means for the plan's implementation, such as ... modification of any lien; ... extension of a maturity date or a change in an interest rate or other term of outstanding securities.").

RMR acknowledges that a business justification exists for extending the maturity date of its loan for at least two years based on the current real estate market. However, RMR argues, and the Court agrees, that LCI failed to establish a maturity date of four years is necessary to effectuate its plan. LCI is solvent, and Mr. Good anticipates that his continued operation of the Debtors, including LCI, will generate approximately $85,000,000 in equity over the next four years. It would offend the priorities of the Bankruptcy Code to allow Mr. Good to accumulate or reinvest this equity over the next four years, without fully satisfying RMR's claim, when the undisputed evidence shows that RMR's allowed secured claim could be satisfied in less than four years. The Court concludes, upon reconsideration, that LCI has established grounds for extending the maturity date for, at most, three years based on the current real estate market.

---

[3] In the Motion for Reconsideration, RMR acknowledges that a business justification exists for extending the maturity date for up to two years. RMR states in its reply to the Debtor's response to the Motion for Reconsideration that it would be willing to accept a term of three years if this Court establishes an appropriate rate of interest that is no less than the contract rate.

16

The Court recognizes that RMR will receive only minimal principal and payments from LCI unless and until LCI sells some portion of RMR's collateral, which constitutes a negative amortization of its loan balance. A plan containing a negative amortization provision is not per se impermissible. *See, e.g., In re M & S Associates, Ltd.,* 138 B.R. 845, 850-51 (Bankr. W.D. Tex. 1992). The Court in this case has determined that LCI's plan is feasible and was filed in good faith. Although the value of the real property securing RMR's claim appears to have declined during the pendency of this case, RMR remains oversecured. Moreover, RMR's argument regarding its eroding equity cushion does not assign any value to its security interest in the mineral rights associated with the real property. *Compare In re Pikes Peak Water Co.,* 779 F.2d 1456, 1459 and 1461 (10th Cir. 1985) ($3,500,000 value securing $2,887,000 debt is both adequate protection and an indubitable equivalent for purposes of §1129(b)(2)(A)(iii)). RMR has failed to establish that the Court erred in determining that its equity cushion in this case is sufficient to protect its secured claim from erosion. *See In re TMA Associates, Ltd.,* 160 B.R. 172, 177 (D. Colo. 1993). RMR's contractual default rate of interest as well as the continuing equity cushion provided under the plan adequately compensates RMR for any risk imposed by the extended, three-year maturity date of its note.

## CONCLUSION

For the foregoing reasons, the Court concludes that RMR has established grounds for relief from the Confirmation Order under Rule 59(e). The Motion for Reconsideration shall be granted, in part, with respect to the cramdown rate of interest and the maturity date of RMR's loan under the plan. Further, the Confirmation Order shall be vacated as it relates to LCI's treatment of RMR. The Court will enter a separate

Order consistent with this Memorandum Opinion and will schedule a status conference on LCI's plan of reorganization.

Signed on 04/13/2009

_____ SR
ROBERT C. McGUIRE
UNITED STATES BANKRUPTCY JUDGE

18